2025 IL App (2d) 240540
No. 2-24-0540
Opinion filed July 22, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DPH AURORA PROPERTIES, LLC, and BELÉN GONZÁLEZ, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 24-CH-32 |
| THE CITY OF AURORA, RICHARD IRVIN, in His Capacity as Mayor of the City of Aurora, RUTHY HARRIS, in Her Capacity as Property Standards Manager for the City of Aurora, HERNÁN MAGANA, in His Capacity as Code Inspector for the City of Aurora, | ) ) ) ) ) ) ) | Honorable Kevin T. Busch, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Birkett concurred in the judgment and opinion.

## OPINION

¶ 1    In March 2024, plaintiffs, DPH Aurora Properties LLC (DPH) and Belén González, filed a four-count complaint against defendants, the City of Aurora (City), Richard Irvin, Ruthy Harris, and Hernán Magana, challenging the validity of the City's ordinances related to rental properties. The trial court granted defendants' motion to dismiss plaintiffs' complaint. Plaintiffs appeal from this order. We affirm in part, reverse in part, and remand for additional proceedings.

¶ 2                                    I. BACKGROUND

¶ 3      In 2018, the City adopted the 2015 International Property Maintenance Code (Int'l Prop. Maint. Code (Int'l Code Council 2015)) as the property maintenance code for the City, with certain additions and deletions enumerated in section 12-102 of division 12-IV-1 (titled "Generally") of article 12-IV (titled "Property Maintenance") of the City code of ordinances (City code). Aurora Code of Ordinances §§ 12-101, 12-102 (amended June 12, 2018) (adopting the 2015 edition of the International Code Council's International Property Maintenance Code). Section 12-102 of the City code amended the adoption of section 113.1 of the International Property Maintenance Code to state that property owners who rented their property were required to obtain a license. Aurora Code of Ordinances § 12-102 (amended June 12, 2018) (adopting Int'l Prop. Maint. Code § 113.1 (Int'l Code Council 2015), as amended). Section 113.1(C) required that all license applications must include (1) proof of a crime-free lease addendum and (2) a background check verification owner's affidavit for every resident 18 years and older. *Id.*

¶ 4      Section 113.1 further provided, as to properties that were unleased at the time of license application but leased by the time of a scheduled property inspection, the lease addenda and background check affidavits were to be provided to the City inspector 14 days prior to the inspection. *Id.* Section 113.5 provided, in part, that the City can revoke or suspend a license if any requirements of the Code are violated and that "[c]ontinuance of use of [*sic*] without a valid license shall incur fines up to $1,000 per unit per day." Aurora Code of Ordinances § 12-102 (amended June 12, 2018) (adopting Int'l Prop. Maint. Code § 113.5 (Int'l Code Council 2015), as amended).

¶ 5      Section 113.9 required that rental properties were subject to an annual inspection to be attended by either owners or licensed management agents. Aurora Code of Ordinances § 12-102 (amended June 12, 2018) (adopting Int'l Prop. Maint. Code § 113.9 (Int'l Code Council 2015), as

amended). The City's website stated that the purpose of the annual inspections was to ensure compliance with health, sanitary, and maintenance requirements contained in the building code. Section 113.9 further stated:

"The current inspection bye system shall remain in place until the Property Standards Division fully implements the STAR Landlord, and Property Manager Registration system and informs each registrant of their current STAR status. *** Inspection passing percentage of owner or agent, quantity and severity of violations, plus quantity of validated calls for disorderly conduct and part 1 crimes will be utilized to determine inspection frequency. The city reserves the right to terminate the waiver and reinstate the annual inspection requirement in the event that violations are discovered or complaints require investigation. Inspections shall be attended by either owners or licensed management agents." *Id.*

¶ 6        Section 104.3 of the International Property Maintenance Code, adopted into the City code and titled "Right of Entry," states:

"Where it is necessary to make an inspection to enforce the provisions of this code, or whenever the code official has reasonable cause to believe that there exists in a structure or upon a premises a condition in violation of this code, the code official is authorized to enter the structure or premises at reasonable times to inspect or perform the duties imposed by this code, provided that if such structure or premises is occupied the code official shall present credentials to the occupant and request entry. *** If entry is refused, the code official shall have recourse to the remedies provided by law to secure entry." Aurora Code of Ordinances § 12-101 (amended June 12, 2018) (adopting Int'l Prop. Maint. Code § 104.3 (Int'l Code Council 2015)).

¶ 7     The City had previously enacted article 12-X of the City code to regulate landlord-tenant leases. Section 12-402 stated that the intent was "to protect and preserve the city neighborhoods' public health, safety and welfare of its citizens." Aurora Code of Ordinances § 12-402 (amended Feb. 24, 2009). Section 12-402, titled "Criminal Background Investigation," stated that "[t]he landlord shall conduct, or have conducted by a reputable agency, a criminal history/background investigation on prospective tenants of rental property in the City" and that "[f]ailure to comply with the requirements in this section may result in suspension or revocation of rental license(s) for the landlord." *Id.*

¶ 8     On the City's website there is a frequently asked question, "Am I required to run background checks on my tenants each year?" The response is:

> "No. You are only required to run a criminal background check each time you have a new tenant 18 years or older. However, you are required to show proof of this background check at each inspection. Property Standards does not maintain any background check information because of the confidential nature of such information. Additionally, you are required to provide a City of Aurora Lease Addendum with your registration/renewal [and] at the time of inspection signed by all tenants 18 and older." See *FAQs*, City of Aurora, Illinois, https://www.aurora.il.us/Property-and-Business/Property-Violations-and-Complaints/Residential-Property-Standards/FAQs (last visited July 9, 2025) [https://perma.cc/6S3M-BQKG].

¶ 9     Section 12-403, titled "Property Leases," stated that all landlords shall incorporate a "crime-free agreement" into their leases or as an addendum to all leases that must be signed and dated by all adult tenants occupying the rental property. Aurora Code of Ordinances § 12-403 (adopted Oct. 14, 2008). The ordinance set forth the requisite language to be used and the City

also provided a standardized landlord-tenant lease addendum form. The lease addendum required that tenants and members of every unit and invited guests do not engage in any unlawful activity. This section also required landlords to incorporate, into all leases, the first and last names of all individuals who will reside or operate businesses at the subject property during the lease term. It further stated that all "landlords shall also require their tenants, as a condition of their lease, to provide written notice containing the first and last names of any guests who will be temporarily residing at the subject property for more than a calendar week (seven (7) consecutive days)." *Id.* Further, "[l]andlords shall provide, upon either oral or written request, copies of the information required in [section 12-403] to the City of Aurora Police Department, Law Department and/or the Division of Property Standards." *Id.* Section 12-405 provided for the imposition of penalties for failure to comply with the lease addendum and criminal background check requirements of the City code. *Id.* § 12-405. Section 111.1 of the International Property Maintenance Code, as adopted by the City code, provided that "[a]ny person directly affected by a decision of the code official or a notice or order issued under this code shall have the right to appeal to the board of appeals." Aurora Code of Ordinances § 12-101 (amended June 12, 2018) (adopting Int'l Prop. Maint. Code § 111.1 (Int'l Code Council 2015)).

¶ 10   On March 1, 2024, plaintiffs filed a four-count complaint against defendants, alleging that the City code violated their constitutional rights. DPH owned a rental property with 21 units located at 1301 E. Indian Trail in Aurora, and González was one of the tenants. Attached to the complaint as "Exhibit A" were e-mails exchanged between the parties. Specifically, on November 14, 2023, at 11:27 a.m., Elizabeth Davis, representing DPH, sent an e-mail to Magana, the City's code inspector, commenting that he originally stated only 11 units needed to be inspected but that morning told her all 21 units needed to be inspected. She questioned why Magana mentioned fining

them even though they did not cancel the inspection. She also wrote, "To be fair, you did say [tenants] do not have a choice as they are residing in a rental property. The owner has met with the city on several occasions and asked this very question but has never gotten an answer as to why they have no right to refuse."

¶ 11    About an hour later, Magana replied, stating that he was initially confused as to the number of units that needed to be inspected. He wrote that, after speaking with his department heads, they determined that since there were only 21 units, all of them would need to be inspected since there had not been an inspection in several years (apparently due to COVID). He stated that he had sent notice to DPH two weeks prior announcing the inspection and DPH did not respond until the day before the inspection. He further wrote: "13 days were given for every tenant to be notified of this inspection, when I spoke to you this morning you stated only 6 units were ready and accessible for inspection. That is considered a missed inspection, if I would have been on site for the appointment and 15 units were not accessible you would receive a $150 fine per unit. Being that I spoke to you 30 minutes before our appointment and all units were still not accessible a single flat fee of $150 will be charged."

¶ 12    Davis responded: "We did not, and have never at any time refused an inspection. We have fully cooperated by notifying the tenants and some of them did not give permission to enter. What more can we possibly do? After all this work, I fail to see why you canceled 30 [minutes] beforehand. Those who did agree were expecting us at 9:30 this morning. In the past, the city has never inspected every unit at this property." Magana replied, stating that he would "hold off on the fine" but that all 21 units needed to be inspected. He asked if the two-week date discussed on the phone would work and commented that he should have been notified weeks prior to the inspection

date, and not the day before the inspection, that not all units had given permission for an inspection. Davis replied that two weeks was not enough time and that she would get back to him.

¶ 13    On November 15, 2023, Davis sent an e-mail to Magana noting that the leases allowed passing the missed inspection fines to the tenants and that, perhaps if fines were imposed, more tenants would consent to an inspection. She also asked for citations to the ordinances requiring that all units needed to be inspected and detailing potential fines for missed inspections.

¶ 14    Magana replied the next day, stating that department procedure, not an ordinance, required all units to be inspected and imposed a flat $150 fine for missed inspections. Magana said Davis should let him know if she wanted a copy of the fine schedule. As to passing the fine along to its tenants, Magana stated that Davis should contact an attorney for legal guidance. Magana referred Davis to the City's online municipal ordinances and noted that section 113 addressed rental requirements. Finally, he stated that no other extensions would be granted and that the rental inspection of all units would be conducted on November 29, 2023, at 9:30 a.m.

¶ 15    In response, Davis requested the "fine schedule" and stated, "[w]ould you like us to reschedule with the residents who granted permission for November 29 at 9:30 a.m.? If you are going to cancel again, please let us know now. In the meantime, I will see what I can do to get access to more units." Later that day, Ruthy Harris, the City's property standards manager, sent an e-mail to Davis that included a link to the full schedule of the rental program fees, which showed that for a missed inspection, called a "no show," the fee was $150 and that there was a $100 fee per unit for crime-free lease addenda and background checks "missing at [the] time of inspection." Harris also wrote: "All units must be available for inspection on November 29, 2023 @ 9:30 [a.m.]. Inspector Magana will not cancel this appointment. Failure to have all units available for the inspection will result in a fine of $150 and the case being filed for administrative hearings."

¶ 16    On November 20, 2023, Davis replied to Harris asking (1) whether failure to have every unit available for inspection would result in a fine of $150 and (2) if the fine was paid, what would be the purpose of the administrative hearing. Harris responded, confirming that the fine would be $150 and that the purpose of the hearing was for "failure to comply with the rental ordinance requirement."

¶ 17    The plaintiffs' complaint alleged as follows. On November 29, 2023, Magana appeared at the property, but occupants of only eight units had given consent for the inspection. On November 30, 2023, the City imposed fines of $2,850 on DPH, which included one $150 missed inspection fee, 14 individual $100 fees for "no background check," and 13 individual $100 fees for "no lease addendum." The fines were not provided for in the City code but were set by "departmental procedure." The City threatened to continue to fine DPH in the amount of $1,000 per day per unit for 13 units and to revoke its rental license if DPH failed to "coerce consent for warrantless searches from all its tenants" and failed to provide copies of background checks and lease addenda from all its tenants. González had been threatened with court proceedings for exercising her fourth amendment rights, did not want her unit searched without a warrant, and was faced with the possibility that DPH could contractually pass along any fines to her.

¶ 18    The complaint also alleged, citing to "Exhibit B," that on November 30, 2023, Magana sent a notice to DPH stating that access to all units was required, listing what it described as ongoing code violations at the property, and stating that code violations would result in revocation or suspension of DPH's rental license. However, the record does not include an "Exhibit B" attached to the complaint.

¶ 19    Count I of the complaint was titled as a fourth amendment violation for "warrantless inspections." The complaint alleged that, while inspection of a personal residence required consent

or a warrant, the City, through Magana, sought to coerce consent by imposing fines and threatening license revocation. It further alleged that Magana threatened to take any residents who refused warrantless inspections to court. Magana never indicated he would seek a warrant. The complaint alleged that coerced consent did not constitute consent, and that all defendants' actions were taken under color of state law, which caused the deprivation of plaintiffs' rights protected by the U.S. Constitution.

¶ 20    Count II was also titled as a fourth amendment violation for "unreasonable search." It alleged that the City had not adopted a "reasonable system of inspections" because City officials could randomly determine which landlords' units needed to be inspected and how often. Plaintiffs alleged, on information and belief, that there were licensed rental units in Aurora that were never inspected or had not been inspected for decades and that the City did not follow its duty, established in its City code, to inspect every licensed unit annually. Instead, plaintiffs alleged the City randomly chose which units and which landlords that it wished to inspect. It concluded that "as part of its warrantless inspection system, [the City] seeks to impose grievous fines and criminal penalties on the landlords whose buildings it has chosen to inspect."

¶ 21    Count III was titled as a violation of constitutional rights to privacy and equal protection in regard to the requirement for background checks. Plaintiffs alleged that the fines imposed for missing background checks were prompted by DPH not providing copies of the actual background checks to Magana at the November 29 inspection. Plaintiffs asserted that, while the City code required landlords to perform background checks, it did not require that those be provided to the City. Accordingly, because landlords only needed to provide an affidavit that the checks were done, plaintiffs alleged that the requirement for a background check was not rationally related to

a legitimate government interest. Plaintiffs also alleged that requiring background checks on renters, but not homeowners, was also not rationally related to a legitimate government interest.

¶ 22    Additionally, plaintiffs noted that, in Illinois, white families were twice as likely to own their residences rather than rent and that, therefore, the requirement for criminal background checks of renters violated the equal protection clauses of the Illinois and U.S. Constitutions. Plaintiffs alleged that, despite the City code requirement of performing background checks prior to move-in, the City inspectors demanded that all the background checks be rerun for all tenants and then fined them $100 per tenant for failing to do so. Plaintiffs alleged that they had obtained all necessary background checks and provided affidavits so stating to the City. Finally, plaintiffs alleged that requiring background checks forces potential renters to disclose personal information to their landlords. Plaintiffs concluded that "[d]ue to the impact on one or more protected classes, and due to the lack of a sufficiently important governmental interest in the background checks, the requirement of background checks is unconstitutional."

¶ 23    Count IV alleged a claim that the requirement for lease addenda was a violation of one's constitutional right to equal protection. Plaintiffs alleged that the City imposed fines for failure to provide copies of the lease addenda at the time of the November 29 inspection, even though the City code required only that the lease addenda be executed, not that they be provided at the time of inspection. Plaintiffs also alleged that they had executed lease addenda but that the City only requested them so that it could contact tenants and demand warrantless entry. Plaintiffs asserted that the imposition of sanctions for failing to provide copies of lease addenda was not warranted and that plaintiffs were targeted due to certain tenants failing to consent to warrantless searches.

¶ 24    Plaintiffs requested special damages because they were subjected to penalties for exercising their constitutional rights. They had to retain counsel and suffered mental and emotional

distress from fear of bankrupting fines, invasion of their privacy, and coercive pressure from the City. Plaintiffs alleged that they had spent hours compiling documents and working with lawyers, which had taken time away from work and family.

¶ 25    Plaintiffs requested declaratory judgments that (1) the City's rental inspection program was unconstitutional on its face as it authorized the City to punish landlords and tenants for not consenting to a rental inspection, (2) the rental inspection program was unconstitutional as applied because departmental policy authorized the City to punish plaintiffs for not consenting to inspections, and (3) the City code's requirement for background checks was unconstitutional on its face and as applied. Plaintiffs also requested that the City be enjoined from imposing fines or other punishments based on "departmental policy." Plaintiffs also requested damages of $10,000 for the time and effort to bring this suit and nominal damages for the violation of their constitutional rights. Finally, plaintiffs requested an award for reasonable attorney fees, costs, and expenses.

¶ 26    On June 3, 2024, defendants filed a combined motion to dismiss under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2022)). Defendants first argued that the complaint should be dismissed under section 2-615 of the Code (*id.* § 2-615) for failure to state a claim. Defendants asserted that plaintiffs failed to state an individual capacity claim under section 1983 of Title 42 of the United States Code (42 U.S.C. § 1983 (2018)), because, as there were no warrantless searches and they were not treated differently from similarly situated individuals, no one violated their constitutional rights. Defendants also alleged that there were no official capacity claims under section 1983 because, even if plaintiffs' constitutional rights were violated, they failed to allege a widespread policy or that any injury was caused by an individual with final policy-making authority. Defendants asserted that the equal protection claims failed

because there were no alleged comparators, the complaint supplied a rational basis for the challenged ordinances, and the vague and conclusory allegations regarding a violation of the right to privacy were insufficient to state a claim. Defendants argued that dismissal was also warranted under section 2-619 (735 ILCS 5/2-619 (West 2022)) because plaintiffs lacked standing, the claims were not ripe, count IV was defeated by the plain language of the ordinance, and discretionary immunity barred any damages claims.

¶ 27    On August 19, 2024, the trial court held a hearing on defendants' motion. Defense counsel stated that it was unsure whether plaintiffs were bringing their claims under section 1983 and whether the individual defendants were being sued in their personal or official capacities. Regardless, counsel argued that the ordinances should be presumed constitutional and that plaintiffs failed to prove otherwise. Counsel asserted that the language in section 104.3 of the International Property Maintenance Code, as adopted by the City code, that if entry for an inspection was refused the code official would have recourse to the remedies provided by law, established that the code official would need to seek a warrant. As to the fines, defense counsel stated that the $150 fine was for a missed inspection because plaintiffs called the morning of a scheduled inspection and cancelled. The other fines were for failure to provide background check affidavits and lease addenda at the time of the inspection. Counsel asserted that there were no fines for refusing consent.

¶ 28    Plaintiffs' counsel argued that the $150 fine was based on not gaining consent to inspect and that the $100 fines related to the background checks were for not providing the actual background check reports, as DPH had provided the required affidavits. Counsel argued that defendants told DPH that if all tenants did not consent to an inspection, it would not seek a warrant but would take DPH to court, suspend its rental license, and evict all DPH's tenants. Counsel

further argued it was unconstitutional to threaten punishment for exercising one's fourth amendment right to refuse entry. Counsel asserted that the language in section 104.3 of the International Property Maintenance Code, as adopted by the City code, was not a warrant procedure. Further, after some tenants refused entry, the City did not go seek a warrant; rather, it issued fines and threatened administrative hearings, essentially coercing warrantless and nonconsensual searches. As to the fines for background checks and lease addenda, plaintiffs' counsel asserted that they had provided all the background checks affidavits at the inspection, but the inspector wanted to see the actual background check reports. Counsel further asserted that the City code did not require that lease addenda be provided at inspections.

¶ 29    Following arguments, the trial court granted defendants' motion to dismiss. The trial court noted that plaintiffs alleged a constitutional challenge to the City's rental unit rules and alleged a section 1983 claim for damages. The trial court stated that plaintiffs were asserting (1) a facial challenge based on the lack of a warrant requirement, (2) an as-applied challenge because fines were being imposed for refusal to allow an administrative search, (3) that the background checks were a violation of privacy and were not rationally related to a legitimate government interest, and (4) equal protection claims as to the background check and lease addendum requirements.

¶ 30    The trial court found that the facial challenge failed because the ordinance did not authorize warrantless access to rental units and plaintiffs did not allege that any warrantless searches took place. As to the as-applied challenge, the trial court noted again that plaintiffs were not subjected to a warrantless search and that the City code required background check affidavits and lease addenda to be provided to an inspector 14 calendar days prior to a property inspection. The trial court stated that plaintiffs failed to allege that the foregoing was provided at the inspection. The trial court found that the section 1983 claims failed because nothing in the City code authorized a

violation of a person's civil rights. Finally, the trial court found that the background checks and lease addenda did not violate equal protection or the right to privacy. The City had a legitimate interest in ensuring crime-free neighborhoods and there were no allegations that anyone was treated differently than other similarly situated landlords or tenants. The trial court did not direct anyone to prepare a written order, and one was not filed. Thereafter, plaintiffs filed a timely notice of appeal.

¶ 31                                                    II. ANALYSIS

¶ 32     On appeal, plaintiffs argue that the trial court erred in granting defendants' combined motion to dismiss. A combined motion to dismiss filed under section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2022)), allows a party to file a combined section 2-615 and section 2-619 motion to dismiss. *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 32. "A motion to dismiss under section 2-615 challenges the legal sufficiency of the plaintiff's claim, while a motion to dismiss under section 2-619 admits the legal sufficiency of the claim but asserts defenses or defects outside the pleading to defeat the claim." *Cahokia Unit School District No. 187 v. Pritzker*, 2021 IL 126212, ¶ 23. "When ruling on a motion to dismiss under either section 2-615 or section 2-619, a court must construe the pleadings and supporting documents in the light most favorable to the nonmoving party," taking as true "all well-pleaded facts and all reasonable inferences from those facts." *Id.* ¶ 24. We review the dismissal of a complaint pursuant to either section *de novo*. *Id.* A claim should not be dismissed on the pleadings "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." (Internal quotation marks omitted.) *Nyhammer v. Basta*, 2022 IL 128354, ¶ 23 (as to section 2-615 motions); see *Pinkston v. City of Chicago*, 2023 IL 128575, ¶ 22 (same, for section 2-619 motions).

¶ 33                                    A. Counts I and II

¶ 34                                    1. *Facial Challenge*

¶ 35     Plaintiffs' first contention is that the trial court erred in dismissing their facial challenge to the City's rental inspection ordinance. Municipal ordinances are presumed constitutional, and the party challenging the ordinances has the burden of rebutting the presumption and establishing a constitutional violation by clear and convincing evidence. *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 20. When plaintiffs challenge an ordinance as facially invalid, they must establish that there is no set of circumstances where the ordinance would be valid. *In re M.A.*, 2015 IL 118049, ¶ 39. It is difficult to raise a successful challenge to the facial validity of an ordinance because "[t]he fact that a statute could be found unconstitutional under some circumstances does not establish its facial invalidity." *Id.* A court should uphold an ordinance's validity if reasonably possible. *Village of Chatham v. County of Sangamon*, 216 Ill. 2d 402, 417 (2005). We note that municipal ordinances are construed using the same rules that apply to statutes. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008).

¶ 36     In addressing the constitutionality of the City's rental ordinances, plaintiffs rely on *Camara v. Municipal Court of the City & County of San Francisco*, 387 U.S. 523 (1967). In *Camara*, the United States Supreme Court examined whether administrative inspection programs implicate fourth amendment rights. *Id.* at 525. At issue in that case was a housing code that allowed a public health inspector to make an annual inspection of units in an apartment building for possible code violations. *Id.* at 526. A tenant refused to allow the inspection absent a search warrant and was charged by criminal complaint for violating the housing code. *Id.* at 527. The housing code at issue stated that an inspector "upon presentation of proper credentials, [had] the right to enter, at reasonable times, any *** premises." (Internal quotation marks omitted.) *Id.* at 526. The Supreme

Court acknowledged the governmental interest in preventing the unintentional development of conditions which are hazardous to public health and safety but held that administrative searches were still entitled to fourth amendment protections. *Id.* at 534-35. The Court further held that the standard for probable cause to issue an administrative search warrant was "reasonableness." *Id.* at 539. The Court concluded that a tenant or landlord had "a constitutional right to insist that the inspectors obtain a warrant to search and that [tenants and landlords] may not constitutionally be convicted for refusing to consent to [an] inspection." *Id.* at 540; see *City of Los Angeles v. Patel*, 576 U.S. 409, 420-21 (2015) (for an inspection ordinance to be constitutional, it must allow a subject of the search to obtain precompliance review from a neutral decision-maker before being penalized for refusing the inspection).

¶ 37     In the present case, plaintiffs have failed to sustain their burden of showing that the rental inspection ordinance is unconstitutional on its face. While section 113.9 of the International Property Maintenance Code, as adopted in the City code, required an annual inspection, section 104.3 stated that the inspector would "request entry" and that, "if entry was refused," the inspector "shall have recourse to the remedies provided by law." Aurora Code of Ordinances §§ 12-101, 12-102 (amended June 12, 2018) (adopting Int'l Prop. Maint. Code §§ 104.3, 113.9 (Int'l Code Council 2015), as amended).

¶ 38     As such, the ordinance anticipated the possibility that entry could be refused and provided that an inspector may need to seek legal remedies, such as obtaining a warrant. Plaintiffs have failed to cite any portion of the City code that mandates fines or punishment merely for refusing entry. Further, section 111 of the International Property Maintenance Code, as adopted by the City code, provides an appeals process for a landlord or tenant that wishes to contest any actions by the City's code official, and plaintiffs do not allege that there is anything improper about this appeal

process. Therefore, the City code does not provide for warrantless entry or for penalties for merely refusing entry. Accordingly, the City's rental inspection ordinance is not unconstitutional on its face, and to the extent counts I and II raised a facial challenge, the trial court properly granted defendants' motion to dismiss. See *Vonderhaar v. Village of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018) (provision that, if entry for an inspection was refused, the inspector may use "the remedies provided by law" to secure entry was a sufficient warrant requirement because, as a warrantless search is prohibited by the fourth amendment, it could never by a remedy provided by law (internal quotation marks omitted)).

¶ 39    Plaintiffs cite many cases to support their contention that the plain language in section 104.3 cannot suffice as a warrant requirement. However, in most of those cases, there was also a provision in the ordinance that imposed penalties for refusing consent. See *Investment Realty Services, LLC v. City of Allen Park*, No. 18-11476, 2020 WL 230272, at *1 (E.D. Mich. Jan. 15, 2020) (Allen Park code included provision that allowed criminal proceedings if plaintiff refused to allow his rental property to be searched); *Halpern 2012, LLC v. City of Center Line*, 404 F. Supp. 3d 1109, 1121 (E.D. Mich. 2019) (under the city's ordinance, a property owner faced a range of penalties if it refused an inspection); *Garner Properties & Management v. Charter Township of Redford*, No. 15-14100, 2017 WL 3412080, at *12 (E.D. Mich. Aug. 8, 2017) (language similar to that in International Property Maintenance Code section 104.3 was insufficient for a warrant procedure because, under the subject municipal ordinances, a property owner suffered fines if he or she refused the inspection and could only contest the fine after the fact). In the present case, there is nothing in the ordinance that explicitly imposes penalties if a landlord or tenant refuses an inspection.

¶ 40   Plaintiffs also cite cases where similar ordinances were upheld because there was an explicit warrant procedure. See *Mann v. Calumet City*, 588 F.3d 949, 951-52 (7th Cir. 2009) (ordinance, involving point of sale inspection, was constitutional on its face where it explicitly required an inspector to get a warrant if there was an objection); *Tobin v. City of Peoria*, 939 F. Supp. 628, 634 (C.D. Ill. 1996) (ordinance explicitly required city to seek a warrant if consent for inspection was refused); *Hometown Co-operative Apartments v. City of Hometown*, 515 F. Supp. 502, 504 (N.D. Ill. 1981) (explicit warrant procedure). While the language in section 104.3 is not an explicit warrant requirement, it implicitly allows the City to seek a warrant, and as noted, we must uphold an ordinance's validity if reasonably possible. *Village of Chatham*, 216 Ill. 2d at 417. For the foregoing reasons, the trial court properly dismissed plaintiffs' facial challenge to the City's rental inspection ordinance.

¶ 41                                 2. *As-Applied Challenge*

¶ 42   Conversely, however, plaintiffs have stated a claim that the rental inspection portion of the City code is unconstitutional as applied. Specifically, plaintiffs alleged that when certain tenants refused entry, a fine of $150 was imposed and the inspector stated that the matter would be set for administrative hearing for "failure to comply with the rental ordinance requirement." Defendants argued that the $150 fine was due to a "missed inspection," which, on the rental program fee sheet was defined as a "no show." However, plaintiffs alleged, and the attached e-mails support, that defendants knew two weeks prior to the November 29 inspection date that not all residents of the 21 units gave consent for an inspection. Thus, there is a question of fact as to whether the missed inspection fine for a "no show" was merely a means to force tenants to consent to the inspections or a penalty for refusing consent. Under *Camara*, it is improper to impose sanctions against landlords or tenants for exercising their fourth amendment right to refuse entry. *Camara*, 387 U.S.

at 540; see *Black v. Village of Park Forest*, 20 F. Supp. 2d 1218, 1230 (N.D. Ill. 1998) (unconstitutional to charge $60 fee when consent was refused and the city was required to seek a warrant); *Makula v. Village of Schiller Park*, No. 95 C 2400, 1995 WL 755305, at *5-6 (N.D. Ill. Dec. 14, 1995) (motion to dismiss fourth amendment claim denied where ordinance required landlord to give irrevocable consent to inspections in order to obtain rental license and imposed penalties on anyone who refused consent to an administrative search). While the ordinance at issue contemplates that an inspector can seek a warrant, the e-mail exchange attached to the complaint showed that the inspector would set it for administrative hearing for "failure to comply with the rental ordinance" and not specifically to pursue an administrative warrant. As such, the trial court erred in dismissing plaintiffs' claim that the City's rental inspection ordinance was unconstitutional as applied.

¶ 43                                    3. *Ripeness*

¶ 44    Defendants argue that any as-applied challenge to the statute is not ripe because the City had not conducted any warrantless inspections. When determining whether an action is ripe, the court must first determine whether the complaint states an actual legal controversy between the parties. *Reynolds v. Village of Creve Coeur*, 2022 IL App (3d) 210260, ¶ 20. An actual controversy is a legitimate dispute involving an immediate and definite determination of the parties' rights and the resolution of which would help terminate all or part of the dispute. *Id.* "The complaint must show that the underlying facts and issues of the case are not moot or premature" as "[c]ourts cannot pass judgment on mere abstract propositions of law, render advisory opinions, or give legal advice as to future events." *Id.*

¶ 45    In the present case, plaintiffs have stated an actual controversy. The allegations in the complaint raise a question of fact as to whether the missed inspection fee was punitive and based

on the failure to receive consent to inspect all 21 units. Under *Camara*, it is unconstitutional to be sanctioned for exercising one's fourth amendment right to refuse warrantless entry. *Camara*, 387 U.S. at 540. As such, plaintiffs raised a question as to whether the statute is being applied in a constitutional manner and that question is ripe for review. See *Tobin*, 939 F. Supp. at 635 (an issue is ripe for review where there is immediate or impending threat of injury from the ordinance's operation or enforcement).

¶ 46                                      B. Counts III and IV

¶ 47     Plaintiffs' next contention on appeal is that the trial court erred in dismissing their claims challenging the constitutionality of the City code provisions requiring a background check and a crime-free lease addendum, arguing that these provisions violate their rights to privacy and equal protection.

¶ 48                                      1. *Right to Privacy*

¶ 49     In the complaint, plaintiffs allege that the requirement for background checks improperly infringes on tenants' right to privacy as personal information must be divulged to landlords. A constitutional right to privacy is implied in the United States Constitution and explicitly provided for in the Illinois Constitution (Ill. Const. 1970, art. I, § 6). *People v. Malchow*, 193 Ill. 2d 413, 425 (2000). The right to privacy under the United States Constitution has involved an "individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). The interest in independence in making important decisions has been interpreted "to apply to personal decisions involving marriage, procreation, contraception, family relationships, and child rearing and education." *Malchow*, 193 Ill. 2d at 425. Under the Illinois Constitution, a party has a right to be free from unreasonable invasions of privacy, which goes beyond federal constitutional guarantees

and recognizes a zone of personal privacy that is broad and without restrictions. *Id.* However, this provision is a bar only to unreasonable invasions of privacy. *Id.*

¶ 50    In the present case, a background check is not within the federally recognized areas related to an interest in making important decisions. *Id.* Further, plaintiffs failed to state a claim that the City code improperly allowed disclosure of personal matters or was an unreasonable invasion of privacy. Section 113.1 of International Property Maintenance Code, as adopted in section 12-102 of the City code, requires landlords to submit, with the license application, an affidavit that a background check was complete. Further, the City website states that a landlord only needs to provide proof that a background check was complete but does not need to show the actual background check. Additionally, in paragraph 29 of plaintiffs' complaint they acknowledge that the "ordinance does not require (or permit) such background checks to be submitted to the City for its use, and the ordinance does not contain any requirements or actions to be taken or not taken based on the results of the criminal background check." The City code thus does not provide for disclosure of the information contained in the results of the background check.

¶ 51    Plaintiffs also argue that the requirement of background checks is subject to strict scrutiny because it is an unconstitutional forced disclosure that affects the fundamental right to travel of persons who wish to live in the City. This argument is without merit. As noted, a tenant must give consent to a criminal background check, so it is not a forced disclosure, and the information contained in the background check is not required to be provided to the City. Further, plaintiffs did not allege in their complaint that the requirement of a background check violated their fundamental right to travel and failed to cite, in their brief on appeal, any authority to support such a proposition. Accordingly, any such argument is thus forfeited. *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 32 (arguments not raised in the trial court or supported by

authority on appeal are forfeited). Plaintiffs further argue that the requirement of a background check cannot even pass the rational basis test because, as the information is not provided to the City, it has no rational relationship to any legitimate government interest. Sections 12-400 and 12-402 of the City code state that the purpose of the screening requirement is to protect the health, safety, and welfare of its citizens. Aurora Code of Ordinances § 12-400 (adopted Oct. 14, 2008); Aurora Code of Ordinances § 12-402 (amended Feb. 24, 2009). While the information in the background check is not provided to the City, landlords are still armed with knowledge needed to ensure that a prospective tenant does not present a danger to other residents or to the landlord's property. This requirement thus presents a rational relationship to a legitimate interest of the City. Accordingly, to the extent count III states a claim that the requirement of background checks violated the constitutional right to privacy, that claim was properly dismissed.

¶ 52                                    2. *Equal Protection*

¶ 53     In count III of their complaint, plaintiffs alleged that the City code violated their right to equal protection because homeowners, who are twice as likely to be white families, are treated differently than renters. In count IV, plaintiffs allege that the requirement to provide crime-free lease addenda violated their right to equal protection because they were targeted for their failure to consent to warrantless searches. "The equal protection clause guarantees that similarly situated individuals will be treated in a similar manner ***." *In re M.A.*, 2015 IL 118049, ¶ 24. Equal protection does not forbid all classifications; it merely prevents persons " ' "who are in all *** respects alike" ' " from being treated differently. (Emphasis omitted.) *Id.* ¶ 25 (quoting *In re Derrico G.*, 2014 IL 114463, ¶ 92, quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). An equal protection challenge fails where a party fails to show that he is similarly situated to a comparison group. *Id.* ¶ 26.

¶ 54    In the present case, in their equal protection claims, plaintiffs failed to allege facts to support a conclusion that homeowners are similarly situated to renters or that they were treated differently than similarly situated landlords or tenants with respect to the requirements for background checks and crime-free lease addenda. Accordingly, plaintiffs' equal protection claims were properly dismissed for failure to state a cause of action. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31 (while a court must accept as true all well-pleaded facts, a court cannot accept as true mere conclusions unsupported by specific facts).

¶ 55    Plaintiffs argue on appeal that section 12-403's mandate that landlords include in their leases a requirement that renters provide the names of anyone who is planning to reside or operate a business at the subject property and provide the names of any guest that will temporarily reside at the property for more than seven days, is unconstitutional because it improperly impinges on plaintiffs' fundamental right to freely associate. However, any such challenge was not alleged in the complaint. It is well settled that the theory upon which a case is tried in the lower court cannot be changed on review. *Kravis v. Smith Marine Inc.*, 60 Ill. 2d 141, 147 (1975). In the complaint, plaintiffs alleged only that the requirement for the crime-free lease addendum violated their right to equal protection because the City code did not require that copies of the lease addenda be provided to an inspector at the time of inspection. Plaintiffs did not allege that it was an unconstitutional impingement on their right to freely associate. The trial court pointed this out at the hearing on defendants' motion to dismiss and plaintiffs did not move to amend the complaint. This argument is thus forfeited. *Bank of New York Mellon*, 2016 IL App (2d) 150712, ¶ 32.

¶ 56                              3. *Authority to Levy Fines*

¶ 57    Plaintiffs also argue on appeal that the City had no authority to levy fines because they were not provided for in the City ordinance. However, it is well settled that municipalities may

"pass all ordinances and make all rules and regulations proper or necessary." 65 ILCS 5/1-2-1 (West 2022). The City's website notified landlords that the crime-free lease addenda and criminal background check affidavits were to be provided to an inspector at the time of inspection. Plaintiffs failed to allege that they were unaware of this requirement. Further, while plaintiffs alleged in the complaint that all the background checks were completed and that affidavits were provided, they did not say when they were provided or to whom they were provided. Plaintiffs also alleged that they had executed lease addenda for all the units but did not allege that they were provided upon oral request by the City, as required by section 12-403 of the City code or at the time of the inspection as stated on the City's website. Further, to the extent plaintiffs feel the fees are improper, they can follow the appeals process provided in section 111.1 of the International Property Maintenance Code, as adopted in section 12-101 of the City code. Aurora Code of Ordinances § 12-101 (amended June 12, 2018) ) (adopting Int'l Prop. Maint. Code § 111.1 (Int'l Code Council 2015)). Accordingly, to the extent that count III alleged that the subject fines were improper, the trial court did not err in dismissing that count. See *Patrick Engineering*, 2012 IL 113148, ¶ 31.

¶ 58                                    C. Defendants' Arguments

¶ 59    In the appellee brief, defendants argue that there are additional reasons that warrant dismissal or partial dismissal of the case. Specifically, they argue that (1) plaintiffs lacked standing, (2) the section 1983 claims were properly dismissed to the extent they attempted to allege liability against the individual defendants in their personal capacities and liability against the City and the individual defendants in their official capacities, and (3) any conceivable state law claims for damages were properly dismissed under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2022)).

¶ 60                                    1. *Standing*

¶ 61    Defendants argue that plaintiffs have no standing to raise their fourth amendment claims. The doctrine of standing " 'is designed to preclude persons who have no interest in a controversy from bringing suit,' and 'assures that issues are raised only by those parties with a real interest in the outcome of the controversy.' " *Nationwide Advantage Mortgage Co. v. Ortiz*, 2012 IL App (1st) 112755, ¶ 24 (quoting *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999)). In order to have standing to challenge the constitutionality of a statute, a party must have sustained, or be in immediate danger of sustaining, a direct injury as a result of the enforcement of the challenged statute. *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23 (2004). "The claimed injury must be (1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Id.*

¶ 62    In a declaratory judgment action concerning the construction of a municipal ordinance, two requirements must be satisfied to establish standing: (1) there must be an actual controversy and (2) the party seeking a declaration of rights must be interested in the controversy. *Harris Bank of Roselle v. Village of Mettawa*, 243 Ill. App. 3d 103, 109 (1993). Interested parties are those that possess a "personal claim, status, or right which is capable of being affected." *Id.* Therefore, a plaintiff seeking to challenge the constitutionality of a municipal ordinance must have "sustained, or [be] in immediate danger of sustaining, direct injury as a result of enforcement of the challenged statute." *Id.* at 110.

¶ 63    In the present case, plaintiffs have standing to raise an as-applied challenge to the inspection provision of the ordinance. They are interested parties as they have a personal claim, right, or status that is capable of being affected. Specifically, the City had requested consent to conduct warrantless searches and there is a question of fact as to whether plaintiffs were fined for refusing to consent and whether they would be subjected to other sanctions for "failure to comply

with the rental ordinance," as stated in the correspondence attached to the complaint. Further, plaintiffs are in immediate danger of sustaining a direct injury as a result of the enforcement of the challenged ordinance. DPH can lose its license to rent the subject property, and González could then be forced to find another residence. Further, the landlord-tenant lease allows any fines to be passed on to a tenant, such as González.

¶ 64                                                 2. *Section 1983*

¶ 65    Under section 1983 of the Civil Rights Act of 1964, an injured party can sue a "person" who, under color of law, deprives the plaintiff of constitutional rights. 42 U.S.C. § 1983. Municipalities can be "persons" under the act but are liable only if the government's policy or custom caused the constitutional violation. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690, 694 (1978). As stated in *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985):

> "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. [Citation.] Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' [*Monell*, 436 U.S. at 690 n.55.] As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. [Citation.] It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." (Emphasis omitted.)

To state a section 1983 claim against an individual, the plaintiffs must allege sufficient facts to support two elements: (1) that the individual deprived them of a Federal right and (2) that the individual acted under color of State law. *Dempsey v. Johnson*, 2016 IL App (1st) 153377, ¶ 14. For municipal liability, plaintiffs must allege (1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning at minimum, deliberate conduct; and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019).

¶ 66     Defendants argue that plaintiffs failed to state section 1983 claims against Magana, Harris, and Irvin in their personal/individual capacities. We agree. The face of the complaint does not state claims against Magana, Harris, or Irvin in their individual capacities. The complaint is against Irvin in his capacity as mayor, against Harris in her capacity as the City's property standards manager, and against Magana in his capacity as a code inspector. Further, there is no request for any relief from the individual defendants personally.

¶ 67     Defendants also argue that, under *Monell*, plaintiffs failed to state a section 1983 cause of action against the City and its employees because they did not allege a widespread custom or an act by an individual with policy-making authority. A widespread custom claim requires showing that the conduct essentially constituted a governmental policy and was not an isolated incident. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). More than three violations must be alleged to establish deliberate conduct. *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020). Here, with respect to plaintiffs' improperly dismissed challenge that the City's rental inspection ordinance is unconstitutional as applied, plaintiffs did not allege more than three instances of being fined for refusing consent. Rather, as the allegations are limited to the November 2023 fines, plaintiffs have

failed to allege a widespread custom. Additionally, plaintiffs have not alleged that any of the individual defendants acted with final policy-making authority. Accordingly, to the extent plaintiffs have stated a claim that the City's rental inspection ordinance is unconstitutional as applied, they have failed to state a cause of action for which relief can be granted under section 1983. Plaintiffs are therefore limited to seeking relief under state law.

¶ 68                                3. *Tort Immunity Act*

¶ 69    The purpose of the Tort Immunity Act is "to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1 (West 2022). As relevant here, it immunizes public entities from damages claims (*id.* § 2-101) arising from certain acts or omissions, including any injury alleged in a civil action, whether based on the U.S. or Illinois Constitution (*id.* § 1-204). "By providing immunity, the General Assembly sought to prevent the dissipation of public funds on damage awards in tort cases." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368 (2003). Because the Tort Immunity Act operates as an affirmative defense, the burden lies on the public entities and public employees to properly raise and prove their immunity. *Id.* at 370. It is only when this burden is met that a plaintiff's right to recovery is barred. *Id.* Immunity under the Tort Immunity Act is an affirmative matter properly considered in a motion to dismiss. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 331 (2008).

¶ 70    To fall within the Tort Immunity Act's protections, Magana, Harris, and Irvin must have been public employees at the time of the allegedly improper activity. See 745 ILCS 10/2-201 to 2-203 (West 2022). A "public employee" means "an employee of a local public entity" (*id.* § 1-207), and a "local public entity" includes local governmental bodies such as municipalities, counties, and townships (*id.* § 1-206). Magana, Harris, and Irvin are clearly public employees, and the City is clearly a "local public entity."

¶ 71    Further, section 2-109 absolves a local public entity from liability "from an act or omission of its employee where the employee is not liable." *Id.* § 2-109. Consequently, the City may assert any immunity granted an employee to preclude its own liability. Under section 2-203:

> "If a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for any injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable." *Id.* § 2-203.

Section 1-203 defines "enactment" to include an ordinance. *Id.* § 1-203.

¶ 72    Here, plaintiffs fail to allege that any City employee acted in bad faith or with malice. Accordingly, there is no basis for liability even if the ordinances at issue are ultimately held to be unconstitutional. Moreover, under section 2-109 of the Tort Immunity Act, the City may assert the same immunity afforded to its employees for actions taken in good faith reliance on the rental inspection ordinance, even if that ordinance is later deemed invalid. Accordingly, plaintiffs are barred from seeking damages for any violations of their constitutional rights and are limited to declaratory and injunctive relief.

¶ 73                                    III. CONCLUSION

¶ 74    For the reasons stated, the judgment of the circuit court of Kane County is affirmed in part and reversed in part. The matter is remanded for continued proceedings consistent with this order on plaintiffs' state law claim that the rental inspection ordinance is unconstitutional as applied.

¶ 75    Affirmed in part and reversed in part; cause remanded.

*DPH Aurora Properties, LLC v. City of Aurora*, **2025 IL App (2d) 240540**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 24-CH-32; the Hon. Kevin T. Busch, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew D. Robinson, of Geneva, for appellants. |
| **Attorneys for Appellee:** | Jason A. Guisinger, Anthony G. Becknek, and Colleen M. Shannon, of Klein, Thorpe & Jenkins, Ltd., of Westmont, for appellees. |